IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-00714-PAB-STV

ESTATE OF BARTON GRUBBS and
TANYA SMITH, individually and as the personal representative of the Estate of Barton
Grubbs,

      Plaintiffs,

v.

THE WELD COUNTY SHERIFF'S OFFICE,
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF WELD,
CORRECT CARE SOLUTIONS, LLC, and
CHRISTIN HERNANDEZ, in her Individual and Official Capacity,

      Defendants.

---

## ORDER

---

    This matter is before the Court on Defendants the Weld County Sheriff's Office

and the Board of County Commissioners of the County of Weld's Motion to Dismiss the

Third, Fourth and Fifth Claims for Relief of Plaintiffs' First Amended Complaint and Jury

Demand [Docket No. 77] and Defendants Correct Care Solutions, LLC and Christin

Hernandez's Partial Motion to Dismiss [Docket No. 78].

## I. BACKGROUND[1]

    On March 28, 2014, Barton Grubbs committed suicide while in custody at the

Weld County Jail.  Docket No. 66 at 9, ¶ 47; 21, ¶ 186.  The events leading to his death

began on the evening of March 27, 2014 when Colorado State Trooper Travis Tyndall

arrested Mr. Grubbs for driving under the influence.  Docket No. 66 at 6-7, ¶¶ 17-21.

---

[1]The facts below are taken from plaintiffs' amended complaint, Docket No. 66,
and are presumed to be true for purposes of this motion to dismiss.

After being handcuffed, Mr. Grubbs asked Trooper Tyndall to retrieve his pain medication. *Id.* at 7, ¶¶ 24, 26. Trooper Tyndall retrieved a bottle of Percocet and a bottle of Valium from Mr. Grubbs' car. *Id.*, ¶ 26. Trooper Tyndall took Mr. Grubbs to a substation, where they were met by paramedics who confirmed that Mr. Grubbs' medication was in fact Percocet and Valium and permitted him to take one pill of each. *Id.*, ¶¶ 27-31. Trooper Tyndall told Mr. Grubbs to put his medication in Grubbs' inside coat pocket. *Id.* at 8, ¶ 34. Trooper Tyndall then took Mr. Grubbs to the Weld County Jail for booking. *Id.*, ¶ 35. While Trooper Tyndall was filling out paperwork, Mr. Grubbs surreptitiously swallowed all but one of his remaining pills. *Id.* at 8-9, ¶¶ 45-47, 58. During the booking process, Officer Eric Sutherland searched Mr. Grubbs and found the pill bottles. *Id.* at 9, ¶ 57. Officer Sutherland contacted medical staff, and Licensed Practical Nurse ("LPN") Christin Hernandez responded. *Id.* at 10, ¶¶ 59, 61. Nurse Hernandez was an employee of Correct Care Solutions, LLC ("CCS"), which contracts with the Weld County defendants to provide healthcare services, including medical and mental health, for the Weld County Jail. *Id.* at 5, ¶¶ 13-14. Nurse Hernandez examined Mr. Grubbs' pill bottles and stated she would put them into "property." *Id.* at 10, ¶¶ 62-63. Trooper Tyndall told Officer Sutherland and Nurse Hernandez that it was possible that some of the pills were missing. *Id.*, ¶ 65. At the request of Officer Sutherland, Nurse Hernandez took Mr. Grubbs' vital signs, which were normal. *Id.* at 10-11, ¶¶ 66, 75-76.

Officer Sutherland asked Mr. Grubbs if he would tell jail staff members if he were suicidal; Mr. Grubbs stated that he would not. *Id.* at 11, ¶¶ 77-78. As a result, Officer Sutherland scheduled a suicide "staffing" for Mr. Grubbs. *Id.*, ¶ 79. A staffing is a

2

formal suicide evaluation conducted by medical staff and corrections officers.  *Id.*, ¶ 80.

Officer Jennifer Linderlink and Nurse Hernandez conducted the suicide staffing.  *Id.*

at 12, ¶ 87.  During the interview, Officer Linderlink asked Mr. Grubbs if he had taken

any pills; Mr. Grubbs responded that he had taken around 70 Valium while waiting in the

booking vestibule.  *Id.* at 13-14, ¶¶ 99-103.  Nurse Hernandez spoke with her supervisor

to inquire about what she should do as a result of Mr. Grubbs' statements.  *Id.* at 14,

¶ 104.  Nurse Hernandez's supervisor told her to obtain information regarding Mr.

Grubbs' prescriptions and call the provider to inquire as to methods to counteract the

effect of the pills Mr. Grubbs had taken.  *Id.*, ¶ 105.  Nurse Hernandez checked the

prescription levels on Mr. Grubbs' medication bottles, but did not call the provider about

drugs to help Mr. Grubbs.  *Id.*, ¶¶ 107-08.  Nurse Hernandez asked Officer Sutherland

whether it would be possible to review footage from cameras overlooking the booking

area, but neither Nurse Hernandez nor Officer Linderlink requested the tape, which did

in fact show Mr. Grubbs consuming the medication.  *Id.* at 15, ¶¶ 110-12.

At that time Officer Linderlink had Nurse Hernandez check Mr. Grubbs' vitals

again, which she recorded as abnormal.  *Id.*, ¶¶ 115-17.  Mr. Grubbs was transported to

a housing unit and placed on suicide watch level one.  *Id.,* ¶ 119.  Corrections officers

are supposed to observe an inmate on suicide watch level one at no more than five

minute intervals.  *Id.* at 30, ¶ 248.  Nurse Hernandez requested a medical screening for

Mr. Grubbs, but none was conducted.  *Id.* at 16, ¶¶ 125-26.  Mr. Grubbs was placed in

his cell at around 5:00 a.m. and given a suicide watch gown.  *Id.* at 17-18, ¶¶ 139-42.

Officer Lamb checked on Mr. Grubbs approximately an hour and fifteen minutes after he

was placed in his cell.  *Id.* at 18, ¶¶ 143-44.  Officer Steven MacCreery also conducted

walkthroughs during the early morning and observed Mr. Grubbs' foot twitching on at least one occasion.  *Id.*, ¶¶ 148-150.  Sometime after 8:00 a.m., three officers entered Mr. Grubbs' cell to relocate him.  *Id.* at 19, ¶ 155.  Mr. Grubbs never spoke or responded to the officers in any way.  *Id.* at 19-20, ¶¶ 157-160, 171.  Medical staff and paramedics were called, and Mr. Grubbs was transported to Northern Colorado Medical Center, where it was determined that Mr. Grubbs had no brain activity.  *Id.* at 20, ¶¶ 172-75.  Later that day Mr. Grubbs died, never having regained consciousness.  *Id.* at 21, ¶ 186.  The cause of death on his autopsy report was medication overdose.  *Id.*

On March 25, 2016, his estate and personal representative filed this lawsuit seeking damages arising from Mr. Grubbs' death.  Docket No. 1.  On July 26, 2016, plaintiffs filed an amended complaint alleging six claims for relief pursuant to: (1) Colo. Rev. Stat. § 13-21-202 for death by negligence; (2) Colo. Rev. Stat. § 13-20-101 for expenses related to Mr. Grubbs' death; (3) 42 U.S.C. § 1983 for deliberate indifference to medical needs; (4) 42 U.S.C. § 1983 for adoption of an official policy; (5) 42 U.S.C. § 1983 for failure to adequately train or supervise; and (6) common law negligence. Docket No. 66.

Defendants Weld County Sheriff's Office and Board of County Commissioners of the County of Weld (collectively "Weld County defendants") have moved to dismiss plaintiffs' third, fourth, and fifth claims for relief.  Docket No. 77.  Defendants CCS and Christin Hernandez have moved to dismiss plaintiffs' third claim for relief against defendants CCS and Hernandez and plaintiffs' sixth claim for relief against defendant Hernandez.  Docket No. 78.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege

enough factual matter that, taken as true, makes the plaintiffs' "claim to relief . . .

plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged – but it has not shown – that the pleader is entitled to relief."

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration

marks omitted). Thus, even though modern rules of pleading are somewhat forgiving,

"a complaint still must contain either direct or inferential allegations respecting all the

material elements necessary to sustain a recovery under some viable legal theory."

*Bryson,* 534 F.3d at 1286 (alteration marks omitted).

## III. ANALYSIS

Local governments may not be sued under 42 U.S.C. § 1983 on a theory of

respondeat superior. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692 (1978).

Instead, local governing bodies can be sued directly only where "the action that is

alleged to be unconstitutional implements or executes a policy statement, ordinance,

regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at

690 (footnote omitted). "[I]t is when execution of a government's policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the injury that the government as an entity is responsible

under § 1983." *Id.* at 694.

5

In order to state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation. *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). The plaintiff must further show that "the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted). A municipal policy or custom can take the form of "(1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

6

With this background in mind, the Court considers whether dismissal of the challenged claims is appropriate.

### A.  Plaintiffs' Third Claim for Relief – Deliberate Indifference to Medical Needs

"Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the same degree of protection against denial of medical care as that afforded to convicted inmates under the Eighth Amendment." *Estate of Hocker by Hocker v. Walsh*, 22 F.3d 995, 998 (10th Cir. 1994).  To bring a claim for deliberate medical indifference against an institution, plaintiff must allege "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care."  *See Garcia v. Salt Lake Cty.*, 768 F.2d 303, 308 (10th Cir. 1985) (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).  To bring a claim for deliberate indifference to medical needs against an individual, a plaintiff must allege: "(i) that he suffered from a serious medical need – that is, one that has been diagnosed by a medical provider as requiring treatment or one which even a lay person would easily recognize as requiring medical attention; and (ii) the Defendant was subjectively aware of that need and that failing to treat it would pose an excessive risk to the inmate's health or safety, but nevertheless elected to delay or deny treatment for it."  *Ajaj v. Fed. Bureau of Prisons*, No. 08-cv-02006-MSK-MJW, 2011 WL 902440, at *16 (D. Colo. Mar. 10, 2011) (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).  The first prong is examined objectively, while the second is examined subjectively and takes into account whether a prison official "knows of and disregards an excessive risk to inmate

health or safety." *Sealock*, 218 F.3d at 1209 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

### 1. Weld County Defendants

The Weld County defendants argue that plaintiffs' third claim for relief presents mere boilerplate recitations of the elements of deliberate indifference and, moreover, that plaintiffs' allegation that Weld County had a policy of deferring to medical staff on admittance decisions demonstrates that the Weld County defendants were unable to provide medical care to Mr. Grubbs.  Docket No. 77 at 4.  Plaintiffs respond by arguing that the agreement between the Weld County defendants and CCS has a built-in deliberate indifference in healthcare standards for inmates by defining one standard for emergency medical services for visitors and employees and another standard for detainees and inmates.  Docket No. 81 at 3-4.

The allegations in the amended complaint, however, demonstrate that the Weld County defendants' policy did not effectively deny Mr. Grubbs access to a hospital. According to plaintiffs, despite the different standards of care for inmates and visitors, "three other prisoners were had [sic] already been taken to the hospital" on the same evening Mr. Grubbs was admitted.  Docket No. 66 at 17, ¶ 131.  Plaintiffs state that, because these other inmates were taken to the hospital, Mr. Grubbs was not.  *Id.* However, the policy identified by plaintiffs does not limit the number of individuals to be taken to the hospital and the amended complaint confirms that Mr. Grubbs could have been taken to the hospital had the medical staff determined it was necessary.  *Id.* at 16, ¶¶ 127-28.  Based on the allegations in the amended complaint, the policy identified by plaintiffs in response to the motion to dismiss did not cause the death of Mr. Grubbs.

Although defendants do not directly raise the issue, the amended complaint also does not allege that there was insufficient medical staff present at the Weld County jail to advise corrections officers.  In *Garcia v. Salt Lake Cty.*, the Tenth Circuit affirmed a finding of deliberate indifference where a pretrial detainee died while no medical personnel were present at the jail.  768 F.2d at 308.  The jail housed as many as 400 inmates at a time, but only had a physician on site three days a week for two hours, a nurse four to five hours five days a week, and a medical technician daily from 5:00 a.m. to 9:00 p.m.  *Id*; *see also Ramos v. Lamm*, 639 F.2d 559, 576-79 (10th Cir. 1980) (discussing minimal staffing at a large prison facility and finding that the services were grossly inadequate).  Unlike those cases where deliberate indifference was found, there were medical staff present at the Weld County jail and they were free to make a determination that Mr. Grubbs needed to be hospitalized.  Their failure to do so was not a result of the policy differentiating between visitors and detainees.

The policies described by plaintiffs in the amended complaint do not demonstrate deliberate indifference on the part of the Weld County defendants.  Accordingly, plaintiffs' third claim will be dismissed as to the Weld County defendants.

### 2. Defendant CCS

Plaintiffs argue that defendant CCS has an agreement with the Weld County defendants to provide inmate health services.  Docket No. 66 at 25, ¶ 206.  Pursuant to that agreement, CCS has the "right, ability and duty to control certain activities providing health services to inmates of the Weld County Jail*." Id.,* ¶ 207.  The agreement defines "the policy for emergency medical services in the jail for visitors, employees and detainees or inmates" and "differentiates who will pay for the emergency medical

services depending on whether the detainee is being processed into the Weld County Jail or has already been booked into the jail." *Id.* at 26, ¶¶ 215-16. Defendant CCS "has a budgetary monetary cap on booked detainee's hospitalization costs." *Id.* at 27, ¶ 218. According to plaintiffs, the policy for "emergency medical services creates a deliberate indifference in health care standards to an inmate." *Id.*, ¶ 219.

While *Monell* explicitly applies to municipal governments, the Tenth Circuit has extended the *Monell* doctrine to private entities acting under color of state law. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted). An entity like CCS, however, "cannot be held liable solely because it employs a tortfeasor – or, in other words . . . cannot be held liable under § 1983 on a respondeat superior theory." *Id.* (quoting *Monell*, 436 U.S. at 691.). "[T]o hold the entity liable, the plaintiff must identify an official policy or a custom that is the 'direct cause' or 'moving force' behind the constitutional violations." *Aguilar v. Colorado State Penitentiary*, 656 F. App'x 400, 403 (10th Cir. 2016) (unpublished) (quoting *Dubbs*, 336 F.3d at 1215).

Defendant CCS argues that plaintiffs do not allege the existence of a policy or practice evincing deliberate indifference to a serious medical need. Docket No. 78 at 3. The only CCS policy identified in the complaint is that CCS has "a budgetary monetary cap on booked detainee's hospitalization costs, [which] creates a deliberate indifference in health care standards to an inmate." Docket No. 66 at 27, ¶¶ 218-19. Nowhere in the amended complaint do plaintiffs argue that the budget was the moving force behind defendants' decision not to send Mr. Grubbs to the hospital. Even if the budget were a cause, the mere existence of a budget does not demonstrate deliberate indifference. *Sherman v. Klenke*, 653 F. App'x 580, 592 (10th Cir. 2016) ("The naked assertion that

10

Defendants considered cost in treating [an inmate's] hernia does not suffice to state a claim for deliberate indifference") (citing *Winslow v. Prison Health Servs.*, 406 F. App'x 671, 674 (3d Cir. 2011) (unpublished)); *see also Morris v. Livingston*, 739 F.3d 740, 748 (5th Cir. 2014) ("[T]he deliberate indifference standard . . . does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society.") (quoting *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997)).

Plaintiffs' response identifies two policies to support their third claim for relief against CCS: a policy of treating detainees and non-detainees differently for their medical needs and the custom of using LPNs to evaluate patients and direct treatment. Docket No. 80 at 5.  The Court has already addressed the first of these policies above and found that it does not warrant liability under § 1983 based on the facts alleged by plaintiffs.  As to the second policy, plaintiffs' amended complaint makes no reference to the propriety or impropriety of using LPNs to conduct evaluations of detainees.  Thus, plaintiffs' argument does not provide a ground to deny the motion to dismiss.  *See Cty. of Santa Fe, N.M. v. Pub. Serv. Co. of New Mexico*, 311 F.3d 1031, 1035 (10th Cir. 2002) ("In deciding a Rule 12(b)(6) motion, a federal court may only consider facts alleged within the complaint.").  Even if the Court were to consider plaintiffs' identified custom, plaintiffs' conclusory assertion that "the roles of LPNs, registered nurses and physicians are unclear and contributed to Mr. Grubbs' death," Docket No. 80 at 4, does not state a claim.  There are no factual allegations in the amended complaint that Nurse Hernandez, or other CCS staff, were barred by CCS policy from providing adequate care or that role confusion contributed to the death of Mr. Grubbs.  *Compare Lawson v.*

*Dallas Cty.*, 286 F.3d 257, 263 (5th Cir. 2002) (finding deliberate indifference where institutional policies prevented nurses from seeing patients regularly and providing sufficient care).

Accordingly, plaintiffs' third claim will be dismissed as to defendant CCS.

### 3.  Defendant Hernandez

Defendant Hernandez argues that she is entitled to qualified immunity on plaintiffs' third claim for relief.  Docket No. 78 at 5-6.  "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Qualified immunity provides immunity from trial and the other burdens of litigation such as discovery, rather than merely a defense to liability.  *See Saucier v. Katz,* 533 U.S. 194, 200 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223. Therefore, a court should resolve questions of qualified immunity at the earliest possible stage of litigation.  *Anderson v. Creighton,* 483 U.S. 635, 646 n.6 (1987).  However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard.  *Currier v. Doran,* 242 F.3d 905, 916-17 (10th Cir. 2001).

The parties dispute whether defendant Hernandez is covered by the doctrine of qualified immunity.  "For private parties, courts 'look both to history and to the purposes that underlie government employee immunity' to determine whether qualified immunity applies." *The Estate of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1107–08 (10th Cir. 2016) (quoting *Richardson v. McKnight*, 521 U.S. 399, 404 (1997)).  Qualified immunity serves three purposes: first, "qualified immunity 'protect[s] the public from

unwarranted timidity on the part of public officials'"; second, it works "to ensure that talented candidates [are] not deterred by the threat of damages suits from entering public service"; third, it "reduces the chance that lawsuits will distract officials from their governmental duties." *Rosewood Servs., Inc. v. Sunflower Diversified Servs.*, Inc., 413 F.3d 1163, 1166-67 (10th Cir. 2005) (quoting *Richardson*, 521 U.S. at 408). In *Richardson,* the Supreme Court made clear that its holding was limited to the situation before it, "in which a private firm, systematically organized to assume a major lengthy administrative task (managing an institution) with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms." 521 U.S. at 413.

The Tenth Circuit has not decided whether qualified immunity is available "to employees of a private company providing medical services to inmates." *Kellum v. Mares*, 657 F. App'x 763, 768 n.3 (10th Cir. 2016) (unpublished). However, the other circuits to have addressed this question have all found that qualified immunity is unavailable to employees of a private company providing such medical services. *See McCullum v. Tepe*, 693 F.3d 696, 704 (6th Cir. 2012) (refusing to apply qualified immunity to a prison psychiatrist after an inmate committed suicide); *Jensen v. Lane County*, 222 F.3d 570, 577 (9th Cir. 2000) (denying qualified immunity to psychiatrist who provided services pursuant to a government contract); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999) (declining to extend qualified immunity to a privately employed prison physician). While *Richardson* noted that traditionally "the law did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign," *Richardson*, 521 U.S. at 407

13

(citation omitted), the circuit courts to consider this question have rejected the notion that medical professionals who work on behalf of jails have traditionally been afforded qualified immunity. *McCullum*, 693 F.3d at 701-03 (examining the historical analyses in *Hinson* and *Jensen* before conducting its own review of relevant authorities and finding that "the precedents that do exist point in one direction: there was no special immunity for a doctor working for the state").

Defendant Hernandez argues that the public policy factors militate in favor of granting qualified immunity to medical professionals employed by private entities providing services to inmates. Docket No. 83 at 7-8. However, private competition addresses possible timidity on the part of CCS employees and private entities are well-situated to adequately compensate or indemnify employees for potential liability. *Richardson,* 521 U.S. at 409-11 (noting that "[c]ompetitive pressures mean not only that a firm whose guards are too aggressive will face damages . . . but also that a firm whose guards are too timid will face threats of replacement" and that private firms can "offset any increased employee liability risk with higher pay or extra benefits"); *see also Jensen v. Lane Cty.*, 222 F.3d 570, 578 (9th Cir. 2000) (applying the rationale of *Richardson* to medical providers employed by private entities). While potential litigation would be a distraction for a medical professional, nothing about the prison context justifies a special exemption. *Richardson,* 521 U.S. at 412 ("[T]he threat of distracting workers from their duties is [not] enough virtually by itself to justify providing an immunity.")

Accordingly the Court declines to extend qualified immunity to defendant Hernandez and dismissal of plaintiffs' third claim for relief as to defendant Hernandez is not warranted.

### B.  Plaintiffs' Fourth Claim for Relief – Adoption of an Official Policy

Plaintiffs' fourth claim seeks relief under § 1983 against the Weld County defendants for adopting an unconstitutional policy pursuant to *Monell*.  Docket No. 66 at 28-29, ¶¶ 232-39.  According to plaintiffs, the Weld County defendants

> created and operated pursuant to an expressly adopted official policy and longstanding practice and custom that does not afford corrections officers an opinion in whether or not to admit an arrestee into the jail but instead leaves it entirely up to the medical staff.

*Id.* at 29, ¶ 236.  The Weld County defendants argue that plaintiffs' fourth claim is deficient because it fails to allege which entity created the policy at issue, when the policy was adopted, how long it has been utilized, and which entity followed the relevant policy.  Docket No. 77 at 5.  Plaintiffs respond that the complaint not only specifically identifies the policy at issue, but also ties the policy to the actions of Officer Linderlink.  Docket No. 81 at 4-5.  In order to state a claim under § 1983 for deliberate indifference based on a policy or practice, plaintiffs must allege "(1) official policy or custom, (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

According to the amended complaint, Officer Linderlink believed that taking Mr. Grubbs to the hospital instead of admitting him would have been safer and that Officer Linderlink was aware of the policy that corrections officers were

not to disagree with medical staff.  Docket No. 66 at 15, ¶ 114; 17, ¶¶ 133-134.

These statements may be sufficient to indicate the policy at issue and

demonstrate causation.  However, as to the third factor, state of mind, the

amended complaint is deficient.

"[A] plaintiff seeking to establish municipal liability on the theory that a

facially lawful municipal action has led an employee to violate a plaintiff's rights

must demonstrate that the municipal action was taken with 'deliberate

indifference' as to its known or obvious consequences." *Schneider*, 717 F.3d at

770 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 398

(1997)).  "The deliberate indifference standard may be satisfied when the

municipality has actual or constructive notice that its action or failure to act is

substantially certain to result in a constitutional violation, and it consciously or

deliberately chooses to disregard the risk of harm.  In most instances, notice can

be established by proving the existence of a pattern of tortious conduct." *Id.*

at 771 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).

While the amended complaint contains the boilerplate statement that

"[d]efendants knew or should have known that this policy would lead to serious

injury," Docket No. 66 at 29, ¶ 237, there are no facts in the complaint to support

this allegation.  *See Smith v. D.C.*, 674 F. Supp. 2d 209, 212 (D.D.C. 2009)

(dismissing case where plaintiff did "nothing more than recite the requisite causal

elements of custom or policy liability based on deliberate indifference – that is,

that the District 'knew or should have known' about possible constitutional

violations yet failed to act").  There is no allegation, for example, that corrections

16

officers, inmates, or others have complained about the policy of deferring to medical personnel, and no allegation that the policy has led to other incidents of inadequate treatment.  Plaintiffs' naked conclusion that the Weld County defendants knew that the policy would lead to serious injury is not entitled to a presumption of truth.  *Id.*  In the absence of factual allegations supporting the Weld County defendants' state of mind, plaintiffs' fourth claim for relief is deficient.

Accordingly, plaintiffs' fourth claim for relief will be dismissed.

### C.  Plaintiffs' Fifth Claim for Relief – Failure to Train or Supervise

Plaintiffs' fifth claim seeks relief pursuant to § 1983 against the Weld County defendants for failure to train or supervise their employees.[2]  Docket No. 66 at 29-32, ¶¶ 240-66.  According to plaintiffs, the Weld County employees should have interceded on behalf of Mr. Grubbs or "questioned the nurses' decision to intake Mr. Grubbs" instead of sending him to the hospital.  *Id.* at 29, ¶ 243.  In addition, plaintiffs argue that the Weld County employees failed to adhere to the suicide protocols by failing to make observations of Mr. Grubbs at five minute intervals.  *Id.* at 30, ¶¶ 245-53.  Based on these policies, plaintiffs argue that the Weld County defendants "knew or should have known that their

---

[2]Plaintiffs allege that the defendant Board of County Commissioners "exerts its influence over the Weld County Sheriff through the budget process." Docket No. 66 at 31, ¶ 258.  This allegation alone is likely inadequate to justify holding the Board of County Commissioners liable.  *Cf. Van Curen v. McClain Cty. Bd. of Cty. Comm'rs*, 4 F. App'x 554, 558 n.1 (10th Cir. 2001) (unpublished) (noting the impropriety of holding a board of county commissioners liable for a failure to train or supervise where the board did not have the power to hire and fire sheriff employees).

employees would fail to use reasonable means to secure a detainee, safeguard a detainee, protect a known suicidal detainee, and fail to provide necessary medical care." *Id.* at 31, ¶ 261.

Where the theory for recovery rests on a failure to train or supervise employees, a plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)); *Brown v. Gray*, 227 F.3d 1278, 1291 (10th Cir. 2000) (applying the same standard to inadequate supervision). Plaintiffs' allegations do not meet this standard.

Plaintiffs allege that the Weld County defendants failed to train their corrections officers to overrule the recommendations of medical personnel. Setting aside the fact that deference to medical personnel is likely appropriate, there is no factual allegation demonstrating that the Weld County defendants knew or should have known that this lack of training would lead to constitutional violations. As discussed above, there is no evidence that the policy generated complaints or has led to other incidents of inadequate medical treatment. *See Smith*, 674 F. Supp. 2d at 212.

As to the failure to train employees to follow suicide protocols, there is no allegation that the Weld County defendants were aware of previous failures to adhere to those protocols. Plaintiffs' claim cannot be supported only by the

events surrounding the death of Mr. Grubbs.  *See Jenkins*, 81 F.3d at 994 ("In

the case where a plaintiff seeks to impose municipal liability on the basis of a

single incident, the plaintiff must show the particular illegal course of action was

taken pursuant to a decision made by a person with authority to make policy

decisions on behalf of the entity being sued.") (citation omitted).  Moreover, there

is no allegation that the Weld County employees did not receive training with

respect to the suicide protocols at issue.  *See Van Curen v. McClain Cty. Bd. of

Cty. Comm'rs,* 4 F. App'x 554, 557 (10th Cir. 2001) (unpublished) (noting the

propriety of summary judgment where evidence showed that jailers were

required to review training materials and obtain relevant certifications).

Plaintiffs fail to allege any facts suggesting that the Weld County

defendants were deliberately indifferent to an obvious risk likely to lead to a

constitutional violation.  The Court finds that plaintiffs' fifth claim for relief is

deficient.

### D.  Plaintiffs' Sixth Claim for Relief – Negligence

Defendant Hernandez moves to dismiss plaintiffs' sixth claim for relief,

which alleges that she was negligent in her treatment of Mr. Grubbs.  Docket No.

78 at 6-9.  To support a claim for negligence against a professional, a plaintiff

must allege "(1) the defendant owed a legal duty to the plaintiff; (2) the defendant

breached that duty; and (3) the breach of duty caused the harm resulting in the

damages alleged."  *Settle v. Basinger,* 2013 WL 781110, at *7 (Colo. App. Feb.

28, 2013) (citation omitted).

19

The amended complaint alleges that defendant Hernandez "owed Mr. Grubbs the basic right to have adequate health care and not deprive him of necessary care." Docket No. 66 at 33, ¶ 269. The amended complaint also states that "Defendant Hernandez is an extension of the physician and the patient-physician relationship pursuant to American Medical Association standards" and that she "assumed a doctor-patient relationship between herself and Barton Grubbs." *Id.*, ¶¶ 274, 276. With respect to allegations of negligence, the amended complaint enumerates multiple ways in which defendant Hernandez was purportedly negligent without reference to a doctor-patient relationship: defendant Hernandez's "patient care decisions in her treatment of Mr. Grubbs were willfully and/or negligently acted in a manner inconsistent with the health or safety of Mr. Grubbs"; "Defendant Hernandez was negligent in making incorrect entries on the patient record of Mr. Grubbs"; "Defendant Hernandez was negligent in treating Barton Grubbs in that she did not do what a reasonable, ordinary nurse would do treating the decedent and thus her conduct fell below the standard of care required of her." *Id.* at 33-34, ¶¶ 278, 280, 283.

Defendant Hernandez argues that plaintiffs have failed to identify a duty of care that she owed to Mr. Grubbs and, in the alternative, that the duty alleged is not identical to the duty that was allegedly breached. Docket No. 78 at 7-8. However, defendant Hernandez does not dispute that she owed a duty to Mr. Grubbs. Docket No. 78 at 7 ("CCS Defendants admit that Nurse Hernandez is 'a licensed practical nurse' as Plaintiffs allege. The duty of a nurse in Colorado is to act as a reasonably careful nurse would act, or refrain from acting as a

reasonably careful nurse would not.") (citations omitted).  Instead, defendants argue that, because plaintiffs allege that defendant Hernandez owed the duty of a physician, the sixth claim must fail.  *Id.* at 8.

As noted above, the complaint alleges that defendant Hernandez owed Mr. Grubbs a duty to provide "adequate health care" and "necessary care." Docket No. 66 at 33, ¶ 269.  According to plaintiffs, defendant Hernandez was negligent because she "did not do what a reasonable, ordinary nurse would do." *Id.* at 34, ¶ 283.  The allegations of negligence in the amended complaint are not limited to a doctor-physician relationship and instead provide that defendant Hernandez's conduct was negligent in light of her duty of care as a nurse.

Accordingly, the Court finds that plaintiffs adequately allege that defendant Hernandez owed a duty and breached that corresponding duty.  Dismissal of plaintiffs' sixth claim for relief is not warranted.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Weld County Sheriff's Office and the Board of County Commissioners of the County of Weld's Motion to Dismiss the Third, Fourth and Fifth Claims for Relief of Plaintiffs' First Amended Complaint and Jury Demand [Docket No. 77] is granted.  It is further

**ORDERED** that Defendants Correct Care Solutions, LLC and Christin Hernandez's Partial Motion to Dismiss [Docket No. 78] is granted in part and denied in part.  It is further

**ORDERED** that plaintiffs' third claim for relief is dismissed as to defendants the Weld County Sheriff's Office, the Board of County Commissioners of the County of Weld, and Correct Care Solutions, LLC.  It is further

**ORDERED** that plaintiffs' fourth and fifth claims for relief are dismissed.

DATED March 8, 2017.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge