IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 16-cv-00714-PAB-STV

ESTATE OF BARTON GRUBBS and
TANYA SMITH, individually and as the personal representative of the Estate of Barton
Grubbs,

      Plaintiffs,

v.

THE WELD COUNTY SHERIFF'S OFFICE,
BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF WELD,
CORRECT CARE SOLUTIONS, LLC, and
CHRISTIN HERNANDEZ, in her Individual and Official Capacity,

      Defendants.

---

**ORDER**

---

      This matter is before the Court on the Rule 702 Motion to Exclude Dr. Metzner's Testimony [Docket No. 138] filed by defendants Correct Care Solutions, LLC and Christin Hernandez, Defendants the Weld County Sheriff's Office and the Board of County Commissioners of the County of Weld's Motion for Summary Judgment [Docket No. 139], and CCS and Nurse Hernandez's Motion for Summary Judgment [Docket No. 144]. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## I. BACKGROUND[1]

      Shortly after midnight on March 27, 2014, Colorado State Patrol Trooper Travis

---

[1]This order will refer to Correct Care Solutions ("CCS") and Nurse Hernandez as the "CCS defendants" and to the Weld County Sheriff's Office and the Board of County Commissioners of the County of Weld as the "Weld County defendants." The following facts are undisputed unless noted otherwise.

Tyndall arrested Barton Grubbs for failing to drive in a single lane and driving while under the influence of alcohol or drugs. Docket No. 139 at 2, ¶ 1; Docket No. 144 at 2, ¶ 1. At Mr. Grubbs' request, Trooper Tyndall retrieved Mr. Grubbs' medications – a bottle of Valium and a bottle of Percocet – from the back seat of Mr. Grubbs' vehicle. Docket No. 139 at 2-3, ¶¶ 2-3; Docket No. 144 at 2, ¶¶ 4, 6. The generic name for Valium is diazepam, while Percocet consists of both oxycodone and acetaminophen. Docket No. 144 at 9, ¶ 65.[2] Mr. Grubbs subsequently requested medical assistance for pain. Docket No. 139 at 3, ¶ 4; Docket No. 144 at 2, ¶ 7. Mountain View Fire Paramedics met Trooper Tyndall and Mr. Grubbs at a Colorado State Patrol substation, where they cleared Mr. Grubbs for transport to the Weld County Jail. Docket No. 139 at 3, ¶ 6; Docket No. 144 at 2, ¶ 8. After the paramedics confirmed that there was no indication Mr. Grubbs was abusing his prescriptions, Docket No. 144 at 2, ¶ 9; Docket No. 144-1 at 4, Mr. Grubbs was permitted to take one Valium and one Percocet in the presence of Trooper Tyndall and the paramedics. Docket No. 139 at 3, ¶ 7; Docket No. 144 at 2, ¶ 10. In preparation for transport to the Weld County Jail, Trooper Tyndall had Mr. Grubbs put on his coat and place his medications in his coat pocket. Docket No. 139 at 3, ¶ 8; Docket No. 144 at 3, ¶¶ 12-13. Mr. Grubbs was then transported to the jail with his hands cuffed behind his back. Docket No. 139 at 3, ¶ 9; Docket No. 144 at 3, ¶¶ 15-16.

Once they had arrived at the Weld County Jail, Trooper Tyndall escorted Mr. Grubbs from the sally port into the booking vestibule. Docket No. 139 at 3, ¶ 10;

---

[2]The Weld County defendants do not address the generic names or components of Valium and Percocet in their summary judgment briefing.

Docket No. 144 at 3, ¶ 17. A sign on the door between the sally port and the booking vestibule stated: "STOP ALL ARRESTEES WILL NOT BE ACCEPTED UNLESS THEY ARE RESTRAINED BEHIND THEIR BACK OR BELLY BELTED." Docket No. 139 at 4, ¶ 11; Docket No. 144 at 3, ¶ 18; Docket No. 144-4.[3] When they were inside the booking vestibule, Trooper Tyndall removed Mr. Grubbs' handcuffs and had him take a seat on a bench. Docket No. 139 at 4, ¶ 12; Docket No. 144 at 4, ¶ 21. Trooper Tyndall then turned his back to Mr. Grubbs and began preparing Mr. Grubbs' arrest paperwork. Docket No. 139 at 4, ¶ 13; Docket No. 144 at 4, ¶ 23. While Trooper Tyndall's back was turned, Mr. Grubbs took the pill bottles out of his pocket and ingested all of the Valium and all but 1 1/2 of his Percocet pills. Docket No. 139 at 4, ¶ 14; Docket No. 144 at 4, ¶ 25.

Deputy Eric Sutherland, of the Weld County Sheriff's Department, arrived in the booking vestibule and informed Trooper Tyndall that arrestees must remain restrained until uncuffed by a Weld County Sheriff Deputy. Docket No. 139 at 4, ¶ 15; Docket No. 144 at 4, ¶ 26.[4] Trooper Tyndall advised Deputy Sutherland that Mr. Grubbs had

---

[3]While plaintiffs admit there was a sign on the sally port door, plaintiffs cite Trooper Tyndall's deposition testimony that he did not see the sign when he entered the booking vestibule. Docket No. 169 at 2, ¶ 11; *see also* Docket No. 169-2 at 17, 67:13-16.

[4]Plaintiffs cite Trooper Tyndall's testimony that he was unaware of Weld County's protocol at the time and note that "[t]here is no mention in Tyndall's statement that Sutherland advised him that Grubbs should be handcuffed." Docket No. 164 at 2, ¶ 26; Docket No. 169 at 2, ¶ 15. However, plaintiffs' record citations do not directly contradict Deputy Sutherland's statement that he informed Trooper Tyndall of Weld County's policy of keeping arrestees handcuffed while in the booking vestibule. Docket No. 145-2 at 1. Because such advisement took place after Mr. Grubbs ingested the pills, it has no apparent relevance.

medications on his person.  Docket No. 139 at 4, ¶ 16; Docket No. 144 at 4, ¶ 28.

Deputy Sutherland called Nurse Christin Hernandez, an employee of CCS, to check Mr.

Grubbs' medication into the jail. Docket No. 139 at 5, ¶¶ 19, 21; Docket No. 144 at 4, 7,

¶¶ 29, 44; Docket No. 169 at 3, ¶ 19; Docket No. 145-2 at 1.  While he was waiting for

Nurse Hernandez to arrive, Deputy Sutherland searched Mr. Grubbs and found the

medication bottles.  Docket No. 139 at 5, ¶ 17; Docket No. 144 at 5, ¶ 30.  After seeing

the bottles, Trooper Tyndall told Deputy Sutherland and Nurse Hernandez that there

was a possibility that an unknown number of pills were missing or that he could be

mistaken as to what the bottles originally contained.  Docket No. 139 at 6, ¶ 26; Docket

No. 144 at 5, ¶ 36.[5]  Trooper Tyndall and Deputy Sutherland both asked Mr. Grubbs if

he had taken any additional medication; Mr. Grubbs responded "no."  Docket No. 139 at

6, ¶¶ 25, 27; Docket No. 144 at 5, ¶¶ 33-34.  Deputy Sutherland asked Mr. Grubbs if he

had ever attempted suicide or if he would tell Deputy Sutherland if he had thoughts of

suicide.  Docket No. 139 at 6, ¶ 30; Docket No. 144 at 6, ¶ 40.  Mr. Grubbs responded

"no" to both questions.  Docket No. 139 at 6, ¶ 30; Docket No. 144 at 6, ¶ 40.  Deputy

Sutherland requested a suicide staffing for Mr. Grubbs.  Docket No. 139 at 7, ¶ 36;

Docket No. 144 at 7, ¶ 45.  Nurse Hernandez also took Mr. Grubbs' vital signs.  Docket

---

[5]Plaintiffs deny this fact in their response to the CCS defendants' motion for summary judgment.  Specifically, plaintiffs state that "Tyndall advised Sutherland and Hernandez that were [sic] a possibility of missing pills, not that there was previously more medication."  Docket No. 164 at 3, ¶ 36.  In the cited portion of his deposition, Trooper Tyndall indicates that he "advised the intake deputy and the nurse it was a possibility that an unknown number of pills were missing, or that I could be mistaken as to what the bottles originally contained."  Docket No. 164-2 at 9, 36:9-25.  Because this testimony supports the fact stated in defendants' summary judgment motions, plaintiff has failed to create a genuine dispute on the issue.

No. 139 at 7, ¶ 32; Docket No. 144 at 6, ¶ 42.[6]

Nurse Hernandez and Deputy Jennifer Lenderink then conducted Mr. Grubbs' suicide staffing.  Docket No. 139 at 8, ¶ 41; Docket No. 144 at 7, ¶ 46.[7]  During the staffing, Mr. Grubbs indicated that he had had thoughts of suicide in the past but was not currently suicidal.  Docket No. 139 at 8-9, ¶ 42; Docket No. 144 at 7, ¶ 48; Docket No. 139-8 at 2-3.[8]  After initially denying that he took any extra medications, Mr. Grubbs admitted to Nurse Hernandez and Deputy Lenderink that he had taken approximately 70 Valium pills in the booking vestibule.  Docket No. 139 at 9, ¶¶ 44-45; Docket No. 144 at 7-8, ¶¶ 51-53.[9]  After taking Mr. Grubbs' vital signs a second time, Docket No. 139 at 9, ¶ 47; Docket No. 144 at 8, ¶ 55, Nurse Hernandez and Deputy Lenderink placed Mr. Grubbs on Level 1 suicide watch and assigned him to housing Unit 6.  Docket No. 139

---

[6]Although plaintiffs deny this fact or admit it in part on the ground that "the validity of [Nurse Hernandez's] findings and whether they were normal are in dispute," plaintiffs do not contest that Nurse Hernandez took Mr. Grubbs' vital signs.  Docket No. 164 at 4, ¶ 42; Docket No. 169 at 4, ¶ 32.

[7]Plaintiffs contend that the term "suicide staffing" is "undefined," but do not cite any evidence showing that one was not conducted.  Docket No. 164 at 4, ¶ 46; Docket No. 169 at 6, ¶ 41.

[8]In response to this statement of fact, plaintiffs assert that defendants have not presented any evidence establishing that Nurse Hernandez and Deputy Lenderink were qualified to conduct a suicide assessment.  Docket No. 169 at 6, ¶ 42.  However, the statement of fact does not make any assertions regarding the qualifications of Nurse Hernandez or Deputy Lenderink.  Nor do such qualifications have any bearing on the accuracy of the questions and answers elicited during the suicide staffing.  Plaintiffs' assertion is therefore irrelevant.

[9]Plaintiffs vaguely admit these allegations "in part," apparently basing an implied denial on there being no evidence that Nurse Hernandez and Deputy Lenderink were qualified to perform a suicide assessment.  However, as reflected in the previous footnote, this assertion is non-responsive and irrelevant.

at 10, ¶ 51; Docket No. 144 at 8, ¶ 56.[10]  At some point between 8:30 a.m. and 8:53 a.m., Mr. Grubbs was found unresponsive in his cell.  Docket No. 139 at 11, ¶ 60; Docket No. 144 at 9, ¶ 63; Docket No. 164 at 8, ¶ 63; Docket No. 144-22 at 2; Docket No. 164-13 at 3.  Mr. Grubbs was transported to Northern Colorado Medical Center where he died on March 28, 2014.  Docket No. 139 at 11, ¶ 61; Docket No. 139-13 at 2.[11]  The autopsy report lists Mr. Grubbs' cause of death as "complications of combined diazepam and oxycodone toxicity" and the manner of death as "suicide."  Docket No. 139 at 12, ¶ 63; Docket No. 144 at 9, ¶¶ 64, 66.

Plaintiffs filed this lawsuit on March 25, 2016.  Docket No. 1.  The operative complaint, filed on July 26, 2016, asserts six claims for relief: (1) wrongful death under Colo. Rev. Stat. § 13-21-202; (2) a claim for expenses related to Mr. Grubbs' death under Colo. Rev. Stat. § 13-20-101; (3) deliberate indifference to medical needs under 42 U.S.C. § 1983; (4) adoption of an official policy under 42 U.S.C. § 1983; (5) failure to adequately train or supervise under 42 U.S.C. § 1983; and (6) common law negligence. Docket No. 66 at 22-34, ¶¶ 187-285.  Plaintiffs' first through third claims for relief are asserted against all defendants, whereas plaintiffs' fourth and fifth claims are asserted only against the Weld County defendants, and their sixth claim is asserted only against Nurse Hernandez.  *See id.*  On August 9, 2016, Magistrate Judge Nina Y. Wang granted defendants' motion to designate Trooper Tyndall as a non-party at fault under

---

[10]The CCS defendants do not specifically assert that Mr. Grubbs was assigned to housing Unit 6, only that he was taken to the East side of the jail.  Docket No. 144 at 9, ¶ 62.

[11]The CCS defendants do not assert any facts relating to the date or location of Mr. Grubbs' death.

Colo. Rev. Stat. § 13-21-111.5(3)(b).  Docket No. 75.[12]  On March 8, 2017, this Court

dismissed plaintiffs' third claim for relief as to CCS and the Weld County defendants.

Docket No. 92 at 21-22.  The Court further dismissed plaintiffs' fourth and fifth claims

for relief in their entirety.  *Id.*

On January 17, 2018, the CCS defendants filed a motion to exclude the

testimony of plaintiffs' expert, Dr. Jeffrey L. Metzner, pursuant to Fed. R. Evid. 702.

Docket No. 138.  On January 24, 2018, the Weld County defendants filed a motion for

summary judgment on plaintiffs' wrongful death claims.  Docket No. 139.  On February

7, 2018, the CCS defendants filed a motion for summary judgment seeking dismissal of

CCS from the lawsuit and an order declaring Trooper Tyndall negligent as a matter of

law.  Docket No. 144.

## II.  MOTION TO EXCLUDE PURSUANT TO RULE 702

The Court will begin by addressing the CCS defendants' Rule 702 motion.

### A.  Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence

702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data; (c) the
> testimony is the product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to the facts of the
> case.

---

[12]Although the motion to designate was filed by the CCS defendants, the Weld
County defendants filed notice of their intent to join the motion on August 4, 2016.
Docket Nos. 72, 74.

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area.  Instead, the Court must "perform[] a two-step analysis."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  After determining whether the expert is qualified, the Court must assess whether the specific proffered opinions are reliable.  *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

Rule 702 thus imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  To perform this role, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).  In assessing reliability, "the court may consider several nondispositive factors: (1) whether the proferred theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  These factors are not applicable in every case.  *See Kumho Tire Co. v. Carmichael*,

526 U.S. 137, 141, 150-53 (1999). Indeed, the trial court has "the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Id.* at 152. Regardless of the specific factors applied, however, the objective of *Daubert*'s gatekeeping requirement remains the same: to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*

Although the proponent of the challenged testimony has the burden of establishing admissibility, *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001)), the reliability standard does not require proof "that the opinion is objectively correct, but only that the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (internal citation omitted).

Assuming the standard for reliability is met, the Court must also ensure that the proffered testimony will assist the trier of fact. *See Kumho Tire*, 526 U.S. at 156; *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006). "Relevant expert testimony must logically advance[ ] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (internal quotation marks and citations omitted). In assessing whether expert testimony will assist the trier of fact, the

Court should also consider "whether the testimony 'is within the juror's common knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'" *Id.* at 476-77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

### B. Analysis

Plaintiffs have designated Dr. Jeffrey L. Metzner, a licensed forensic psychiatrist, to testify regarding "the appropriate protocols in correctional health care," Docket No. 151-3 at 1, and specifically, the propriety of Nurse Hernandez's response to Mr. Grubbs' statement that he had ingested Valium and the preventability of Mr. Grubbs' death after that statement. *See generally* Docket No. 138-5. In his expert report, Dr. Metzner opines that Mr. Grubbs received inadequate care due to Nurse Hernandez's failure to contact the on-call physician, Nurse Hernandez's and Nurse Weatherwax's failure to obtain an emergency mental health consultation, Nurse Hernandez's lack of qualifications to perform a suicide risk assessment, and the insufficiency of the walkthroughs performed by correctional officers as part of the Level 1 suicide watch ("SUW1") process. *Id.* at 10. Dr. Metzner concludes that Mr. Grubbs' death would have been preventable had he received adequate mental health and/or medical treatment during his time at the Weld County Jail. *Id.*

Defendants move to exclude Dr. Metzner's testimony on four grounds: (1) as a forensic psychiatrist, he is not qualified to opine as to the standard of care for nurses; (2) his testimony is irrelevant to the issues in this case; (3) he is not qualified to testify as to whether Mr. Grubbs' death was preventable following completion of the suicide

staffing; and (4) his opinion regarding preventability is unreliable.  Docket No. 138.[13]

### 1. *Standard of Care Opinions*

Defendants argue that Dr. Metzner is not qualified to testify as to the standard of care applicable to licensed practical nurses because he is a forensic and correctional psychiatrist, has minimal experience training and supervising other psychiatrists, and has never directly supervised correctional nurses.  Docket No. 138 at 5, 9.  Plaintiffs respond by highlighting Dr. Metzner's experience "defin[ing] and set[ting] the standards for mental health medical care in correctional facilities" and his "numerous positions, honors, memberships, publications, peered [sic] reviewed journals, books, and reviewed books" demonstrating his qualifications as a correctional psychiatrist.  Docket No. 151 at 4.  Plaintiffs also argue that Dr. Metzner "has not been disclosed to testify regarding nurse standard of care issues."  *Id.* at 5.  They assert that Dr. Metzner's testimony will be limited to "Nurse Hernandez's role in correctional health care," "the communication a nurse has with a physician in the context of correctional health care," and "the standard of care in correctional health care."  *Id.* at 5-7.

As an initial matter, defendants' challenge fails to comply with this Court's Practice Standards, which state that a Rule 702 motion "shall identify with specificity

---

[13]Defendants argue for the first time in their reply brief that Dr. Metzner's opinions are cumulative under Fed. R. Evid. 403 because plaintiffs have admitted to disclosing another expert on the nursing standard of care.  Docket No. 160 at 4. Because this argument is cursory and raised for the first time in defendants' reply, the Court will not consider it.  *See Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived." (internal quotation marks omitted)); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed.").

each **opinion** the moving party seeks to exclude." Practice Standards (Civil Cases),

Judge Philip A. Brimmer, § III.G. Defendants seek to exclude any testimony by Dr.

Metzner regarding "practical nursing," "Nurse Hernandez' care," and the "nursing

standard of care." *See* Docket No. 138 at 5, 9. This formulation is imprecise because it

fails to challenge Dr. Metzner's opinions as they appear in his expert report. *See*

Docket No. 138 at 5, 9; *see also White v. Deere & Co.*, No. 13-cv-02173-PAB-NYW,

2016 WL 482712, at *2 (D. Colo. Feb. 8, 2016) (defendants failed to identify expert

opinions with specificity where they challenged the opinions as summarized in

defendants' motion to exclude and not as they originally appeared in the expert's

report). To the extent that defendants urge the Court to categorically bar any testimony

by Dr. Metzner concerning the care provided by Nurse Hernandez, the Court declines to

do so. Neither federal law governing the admissibility of expert testimony nor Colorado

law governing the competency of medical witnesses supports a rule that a physician is

*never* qualified to opine as to the sufficiency of medical care provided by nursing staff.

*See Gomez v. Palmer*, 2016 WL 212952, at *4 (N.D. Ill. Jan. 19, 2016) (finding doctor

qualified to opine on treatment provided by nurses in prison setting where doctor had

experience working with licensed practical nurses); *Sanford v. Stewart*, 2013 WL

3729175, at *3 (N.D. Ohio July 12, 2013) (holding doctor qualified to opine on actions of

nursing staff where testimony did not address nursing standards of care but rather

basic medical standards regarding when a nurse must report patient symptoms to a

physician); *Hall v. Frankel*, 190 P.3d 852, 858 (Colo. App. 2008) (stating rule that "[a]

trial court shall not permit an expert in one medical specialty to testify against a

physician in another specialty *unless the expert demonstrates a substantial familiarity with the other specialty and a similarity between the standards of care in the two fields*" (emphasis added)).

Although defendants' argument lacks the requisite level of specificity under this Court's practice standards, defendants clearly challenge the opinion, expressed during Dr. Metzner's deposition, that "Nurse Hernandez should have believed Mr. Grubbs when Mr. Grubbs said during the suicide staffing that he took the pills." Docket No. 138 at 5 (citing Docket No. 138-9 at 25, 93:4-95:7). Accordingly, the Court will confine its Rule 702 analysis to that opinion.[14]

The admissibility of Dr. Metzner's opinion "hinges on both state substantive law and federal procedural law." *Nicholson v. Evangelical Lutheran Good Samaritan Society, Inc.*, 2017 WL 3127799, at *29 (D.N.M. July 21, 2017). While Rule 702 governs the admissibility of expert testimony in diversity cases, *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 883 (10th Cir. 2006), a witness's competency to testify regarding a substantive issue, such as the medical standard of care, is dictated by state law. *See McDowell v. Brown*, 392 F.3d 1283, 1295 (11th Cir. 2004); *see also* Fed. R. Evid. 601 ("[I]n a civil case, state law governs the witness's competency regarding a

---

[14]Defendants also assert a general relevancy challenge to Dr. Metzner's testimony as a "correctional and forensic psychiatrist," Docket No. 138 at 9, and argue that plaintiffs should not be permitted to use Dr. Metzner's testimony to "create additional claims in this case." Docket No. 160 at 3. The Court will not consider these arguments because defendants fail to identify the specific opinions being challenged as irrelevant. *See* Practice Standards (Civil Cases), Judge Philip A. Brimmer, § III.G.

claim or defense for which state law supplies the rule of decision.").[15]

Under Colorado law, an expert in one medical specialty may testify regarding the standard of care applicable to a different medical speciality if (1) the testifying expert "is, by reason of knowledge, skill, experience, training, or education, so substantially familiar with the standard of care applicable . . . as to render the witness' opinion testimony as well-informed as would be the opinion of an expert witness practicing in the same specialty as the defendant," or (2) the "standard of care for the condition in question is substantially identical for both specialties." *Melville v. Southward*, 791 P.2d 383, 388-89 (Colo. 1990). Courts in this district have applied these standards in medical malpractice cases involving non-physician defendants. *See, e.g.*, *Harvey v. United States*, No. 04-cv-188-WYD-CBS, 2006 WL 1980623, at *4, *6 (D. Colo. July 13, 2006) (holding, under admissibility rules articulated in *Melville*, that nurse expert was not qualified to opine regarding standards of care for physicians or physicians assistants in Colorado).

The Court agrees with defendants that Dr. Metzner is not qualified to opine as to whether Nurse Hernandez breached the nursing standard of care. Although Dr. Metzner testified that he has developed mental health trainings for health care staff and monitored trainings delivered to LPNs, Docket No. 138-9 at 4-5, 25, 12:7-13:10, 95:8-96:6, there is no evidence that he has directly supervised LPNs, received formal training in nursing standards of care, or worked in such close proximity to nursing staff

---

[15]Defendants cite Colo. Rev. Stat. § 13-64-401 in support of their argument that Dr. Metzner is not qualified to opine on the nursing standard of care. *See* Docket No. 138 at 7. As defendants acknowledge, however, that statute does not apply when the defendant in a medical malpractice case or other proceeding is not a physician. *See id.*

as to become familiar with the applicable standards.

On the other hand, the Court finds that the combination of Dr. Metzner's psychiatry background and his many years of experience developing policies and practices for correctional health care qualifies him to express an opinion as to whether an individual trained in conducting suicide assessments should have believed Mr. Grubbs when he said he had ingested the pills. Dr. Metzner has been working as a licensed psychiatrist in correctional health care settings for nearly forty years. *See* Docket No. 138-9 at 2-3, 4:22-5:16; Docket No. 138-11 at 1. In 1980, he served as the chief of psychiatry for the Colorado Department of Corrections ("CDOC") and worked to develop policies and procedures to remedy deficiencies in CDOC's psychiatric services. Docket No. 138-9 at 3, 7:11-25. Since that time, Dr. Metzner has served as a clinical professor of psychiatry at the University of Colorado Health Sciences Center and as a court-appointed monitor in mental health litigation, ensuring proper implementation of court-ordered remedial plans at correctional facilities across the country. *Id.* at 7-9, 23:4-32:5; Docket No. 138-11 at 1, 5-6; *see, e.g.*, *McClendon v. City of Albuquerque*, 2015 WL 13667177, at *2 (D.N.M. Oct. 13, 2015) (discussing appointment of Dr. Metzner as expert "to evaluate conditions of confinement" at the Metropolitan Detention Center).

These experiences indicate that Dr. Metzner is familiar with the provision of psychiatric care in a correctional setting. They also qualify him to state that an individual adequately trained in conducting suicide assessments should have believed Mr. Grubbs when Mr. Grubbs said he had ingested the pills. Such an opinion does not depend on Dr. Metzner's knowledge of the standard of care applicable to LPNs. Dr.

Metzner cited three bases for his conclusion that Nurse Hernandez should have believed Mr. Grubbs: (1) people who are suicidal are often ambivalent about killing themselves; (2) people will often not tell the truth about being suicidal because they do not want to be stopped from killing themselves; and (3) Trooper Tyndall indicated that there might be pills missing from the two pill bottles. Docket No. 138-9 at 25, 93:4-95:3. Dr. Metzner stated that he would not "be real critical about [an LPN] not being aware" of the first two points; however, he indicated that any such lack of awareness on the part of Nurse Hernandez would demonstrate that she was not qualified to conduct a suicide risk assessment. Docket No. 138-9 at 26, 97:12-98:1. This opinion does not require Dr. Metzner to have knowledge of the standard of care applicable to LPNs.

An issue arises as to what claim testimony about Nurse Hernandez's qualifications to conduct a suicide risk assessment would support. Because Dr. Metzner is not qualified to testify about an LPN's standard of care, his opinions cannot support plaintiffs' negligence claim against Nurse Hernandez. Plaintiffs' claim against Weld County for failure to train its employees was dismissed, Docket No. 92 at 19, and, in any event, did not include allegations concerning CCS or Nurse Hernandez. Moreover, plaintiffs deny making a direct claim against CCS for negligence. *See* Docket No. 144 at 10, ¶ 75; Docket No. 164 at 10, ¶ 75. Finally, plaintiffs provide no explanation of how Dr. Metzner's testimony about the standards for properly conducting a suicide assessment would be relevant to whether Nurse Hernandez was deliberately indifferent under plaintiffs' third claim. As a result, this testimony, while not subject to exclusion under Rule 702, appears to be irrelevant.

### *2. Causation Opinions*

Defendants contend that Dr. Metzner's opinion regarding the preventability of Mr. Grubbs' death at a particular point in time is inadmissible on grounds that (1) Dr. Metzner is not sufficiently knowledgeable about pharmacokinetics, pharmacodynamics, overdose reversal, and resuscitation measures to offer such an opinion; and (2) the opinion is unreliable. Docket No. 138 at 10-15. Plaintiffs' primary response is that defendants' challenge rests on facts not in the record. Docket No. 151 at 10, 12-13. They also assert that Dr. Metzner "testified consistent with the correctional standard of healthcare" and talked "at length" about pharmacokinetics and pharmacodynamics. *Id.* at 12. Finally, plaintiffs argue that Dr. Metzner does not need to be an expert in "resuscitative measures for overdose" because "[h]e only needs to be able to demonstrate that he is qualified to render an expert opinion." *Id.* at 13.

The Court need not address whether defendants' arguments rest on facts not in the record. Regardless of when defendants allegedly should have sent Mr. Grubbs to the hospital, plaintiffs have not demonstrated that Dr. Metzner is qualified to opine regarding the preventability of Mr. Grubbs' death at any point in time. Nor have plaintiffs shown that Dr. Metzner's opinions on preventability are reliable under Rule 702.

During his deposition, Dr. Metzner testified that he could not remember the last time he had prescribed either Valium or oxycodone – the two drugs that caused Mr. Grubbs' overdose. Docket No. 138-9 at 14, 52:1-5. His testimony as to peak absorption times further indicates that he is not knowledgeable about the effects of those drugs. Although he stated that the peak absorption time for Valium is usually

between 1.5 to 3 hours following ingestion, the source upon which he relied listed the average time as falling between 1 and 1.5 hours after ingestion, with a total possible range of .25 to 2.5 hours. *Id.* at 15, 53:1-24. When asked whether he could cite any source indicating that the peak absorption time could be up to 3 hours after ingestion, Dr. Metzner stated that he had not "extensively explored" the issue. *Id.*, 53: 25-54:4. Finally, Dr. Metzner could not identify the peak absorption time for oxycodone and indicated that he "would have to re-look that up." *Id.*, 56:14-23. As to treatments for overdose, Dr. Metzner indicated that he was not familiar with current methods for delaying absorption or pumping the stomach of an overdose patient. *Id.* at 19-20, 72:18-73:1. He further stated that he does not consider himself to be an expert in resuscitative measures for overdose situations. *Id.* at 20, 73:9-11.

The fact that Dr. Metzner has a medical degree does not automatically qualify him to opine that Mr. Grubbs' death was preventable at a particular point in time, *see Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001), and Dr. Metzner's testimony regarding peak absorption times and overdose treatment methods demonstrates that he lacks sufficient expertise to offer such an opinion.[16]

Plaintiffs also fail to demonstrate that Dr. Metzner's testimony on preventability is reliable. During his deposition, Dr. Metzner stated that one of the documents he

---

[16]Plaintiffs cite *Ralston* for the proposition that a witness need not be an expert on a particular medical issue or technique in order to satisfy Rule 702's qualification requirement. *See* Docket No. 151 at 13. The cited portion of *Ralston* discusses the general rule that, "as long as an expert stays within the reasonable confines of his subject area, . . . a lack of specialization does not affect the admissibility of the expert opinion, but only its weight." *Ralston*, 275 F.3d at 970. Here, however, plaintiffs have failed to demonstrate that Dr. Metzner's opinion regarding the preventability of Mr. Grubbs' death falls "within the reasonable confines of his subject area." *Id.*

reviewed in preparation of his expert report was a description of Valium and the pharmacokinetics of Valium and gabapentin. Docket No. 138-9 at 12, 44:8-9. However, when asked to identify the source of that document, he was unable to do so. *Id.*, 44:10-13. Dr. Metzner later relied on a chart of peak absorption times for Valium to formulate his opinions on preventability. *See id.* at 15, 53:4-11. It is not clear whether this is the same document that Dr. Metzner identified earlier in his deposition. In any event, plaintiffs have not presented any evidence concerning the source of the chart or its accuracy.

Not only do the authorities relied upon by Dr. Metzner fail to satisfy the reliability requirements under Rule 702, but they also do not support Dr. Metzner's opinions. Dr. Metzner opined that peak absorption for Valium is usually within 1.5 to 3 hours following ingestion; however, the Valium absorption chart stated that the average time is 1 to 1.5 hours, with a total range of .25 to 2.5 hours. *Id.* at 15, 53:1-11. In his explanation of this discrepancy, Dr. Metzner appears to misconstrue the .25 to 2.5 range as the average time for peak absorption rather than the total range. *See id.*, 53:4-24. Finally, Dr. Metzner was unable to cite any other authority to support his opinion that peak absorption could occur up to 3 hours after ingestion, and he admitted that he had not "extensively explored" the issue. *Id.*, 53:25-54:4.

Based on this testimony, the Court finds that plaintiffs have failed to demonstrate that Dr. Metzner's opinions regarding the preventability of Mr. Grubbs' death were "the product of reliable principles and methods" reliably applied. Fed. R. Evid. 702(c)-(d); *see also McDowell*, 392 F.3d at 1300 (doctor's opinion that plaintiff's "injury could have

been prevented had he entered surgery four hours earlier" was inadmissible where only authority offered in support of theory was a study dealing with the effects of a 48-hour delay in treatment).  Accordingly, Dr. Metzner will not be able to opine that Mr. Grubbs' death was preventable at a particular point in time.

## III.  SUMMARY JUDGMENT MOTIONS

### A.  Legal Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment*.  Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671

(10th Cir. 1998)). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115.

If the party moving for summary judgment bears the ultimate burden of persuasion at trial, it must "support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Celotex Corp.*, 477 U.S. at 331. This "shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial or to submit an affidavit requesting additional time for discovery." *Id.* When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

### B. Weld County Defendants' Motion for Summary Judgment

Plaintiffs assert claims for wrongful death against the Weld County defendants pursuant to Colo. Rev. Stat. §§ 13-21-202.[17] That section provides:

_____

[17]Plaintiffs also assert a claim under Colo. Rev. Stat. § 13-21-101. That section does not create a separate cause of action, but provides that a plaintiff in an action "to recover damages for personal injuries . . . resulting from or occasioned by the tort of any other person, corporation, association, or partnership" may "claim interest on the

When the death of a person is caused by a wrongful act, neglect, or default of
another, and the act, neglect, or default is such as would, if death had not
ensued, have entitled the party injured to maintain an action and recover
damages in respect thereof, then, and in every such case, the person who or the
corporation which would have been liable, if death had not ensued, shall be
liable in an action for damages notwithstanding the death of the party injured.

Colo. Rev. Stat. § 13-21-202.  To prevail on a wrongful death claim under § 13-21-202,
a plaintiff must show: "(1) the death of a person, and (2) a wrongful act that would have
entitled the person 'injured' to maintain an action, had the person survived."  *A.B., by
Ybarra v. City of Woodland* Park, 174 F. Supp. 3d 1238, 1251 (D. Colo. 2016) (quoting
*Stamp v. Vail Corp.*, 172 P.3d 437, 451 (Colo. 2007) (Eid, J., concurring)).  Because
wrongful death claims are derivative, *id.*, they are "subject to the same defenses
available to the underlying claims."  *Elgin v. Bartlett*, 994 P.2d 411, 416 (Colo. 1999).

Plaintiffs in this case premise their wrongful death claim on allegations that the
Weld County defendants were negligent in their care of Mr. Grubbs.  Docket No. 157 at
2; Docket No. 66 at 22-23, ¶¶ 191-92.  Under Colorado law, a claim for negligence
consists of four elements: (1) the existence of a legal duty; (2) breach of that legal duty;
(3) causation; and (4) damages.  *Westin Operator, LLC v. Groh*, 347 P.3d 606, 612
(Colo. 2015).  The Weld County defendants move for summary judgment on two
grounds.  First, they assert that they cannot be liable for Mr. Grubbs' choice to commit
suicide given that "there is no evidence that [defendants] caused Mr. Grubbs to be in a
compromised mental or emotional state at the time."  Docket No. 139 at 13.  Second,
they contend that "there is no evidence that any wrongful act by [defendants] caused

damages alleged from the date the action accrued."  Colo. Rev. Stat. § 13-21-101.

Mr. Grubbs' death."  Docket No. 139 at 13.[18]

### 1. Absence of Evidence that Defendants Caused Mr. Grubbs to be in a Compromised Mental and Emotional State

Defendants' first argument goes to the issue of proximate cause.  *See* Docket No. 139 at 12-13 (citing *Moore v. Western Forge Corp.*, 192 P.3d 427 (Colo. 2007), and Restatement (Second) of Torts § 455); *Moore*, 192 P.3d at 436 (stating that § 455 of the Restatement (Second) of Torts "does not set forth a duty but describes a rule of causation . . . which presupposes an existing legal duty" (internal quotation marks and brackets omitted)).  Under Colorado law, the causation element of a negligence claim has two components: actual cause and proximate or legal cause.  *See Moore*, 192 P.3d at 436.  Actual cause asks whether the defendant's negligence was the but-for cause of the plaintiff's harm, *see Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 987 (Colo. App. 2011), whereas the proximate cause inquiry addresses whether "it is foreseeable that the defendant's negligence will result in injuries to others."  *Build It and They Will Drink, Inc. v. Strauch*, 253 P.3d 302, 306 (Colo. 2011).  As the Colorado Supreme Court has noted, proximate cause principles reflect "an attempt to spell out rules of law limiting the liability of a negligent actor, using the *language* of causation."  *Moore*, 192 P.3d at 436.

---

[18]Defendants also suggest that the Court should consider Mr. Grubbs' comparative fault in ruling on their summary judgment motion.  *See* Docket No. 139 at 12 n.4 (stating that "[t]he volitional or comparative fault component of Mr. Grubbs is a strong consideration with respect to Plaintiffs' wrongful death claims").  Docket No. 139 at 12 n.4.  However, because defendants disclaim any reliance on a comparative fault argument in their reply brief, *see* Docket No. 177 (stating that "the Weld County Defendants' Motion for Summary Judgment is based on arguments entirely independent of the issue of whether Mr. Grubbs was comparatively negligent"), the Court will not consider it.

A defendant's wrongful conduct is not the proximate cause of a plaintiff's injuries "if, in order to bring about such injuries, it was necessary that the conduct combine or join with an intervening cause which also contributed to cause the injuries, but which intervening cause would not have been reasonably foreseen by a reasonably careful person under the circumstances." *Moore*, 192 P.3d at 436. "Because suicide is usually treated as a voluntary and willful choice," courts have often found suicide to constitute an intervening cause sufficient to relieve a defendant of liability for any antecedent acts of negligence. *Id.*[19] However, an exception exists where the defendant's "negligent conduct . . . brings about the delirium or insanity of another" and that delirium or insanity "(a) prevents [the other person] from realizing the nature of his act and the certainty or risk of harm involved therein, or (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason." *Id.* (quoting the Restatement (Second) of Torts § 455). In such cases, a defendant may be held liable for the harm that another person inflicts upon himself because the act of self-harm does not break the chain of causation. *Id.*

By arguing that the Weld County defendants did not cause Mr. Grubbs "to be in a compromised mental or emotional state at the time of his death by suicide," defendants appear to assert that his voluntary act of self-harm broke the chain of

---

[19]Under the Restatement (Second) of Torts, an intervening cause sufficient to relieve a defendant of liability would constitute a "superseding cause." *See* Restatement (Second) of Torts § 440 (defining "superseding cause" as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about"); *see also* Restatement (Second) of Torts § 442 (listing factors to be considered in determining whether an intervening force constitutes a "superseding cause" of harm).

causation between any alleged negligence on the part of defendants and Mr. Grubbs'

death.  However, the rules of intervening and superseding cause only apply when

"another act intervenes *after* the [defendant's] conduct has occurred."  *Archuletta v. City*

*of South Salt Lake*, 2014 WL 5149298, at *5 n.7 (D. Utah Oct. 14, 2014) (citing  *Trask v.*

*Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006)); *see also Moore*, 192 P.3d at 431, 436-

38 (considering intervening and superseding cause principles in context of claim that

defendant's bad faith denial of workers' compensation benefits caused decedent to

commit suicide); Restatement (Second) of Torts § 440 (defining "superseding cause" as

"an act of a third person or other force which by its intervention prevents the actor from

being liable for harm to another which his *antecedent* negligence is a substantial factor

in bringing about" (emphasis added)).  Here, plaintiffs predicate their wrongful death

claims against the Weld County defendants on negligent conduct occurring after Mr.

Grubbs' act of suicide.  Plaintiffs' claim is not that defendants caused Mr. Grubbs to

commit suicide, but rather that defendants negligently failed to obtain proper treatment

for Mr. Grubbs after they were aware that he had ingested the pills.  *See* Docket No.

169 at 14-17 (arguing that Weld County defendants had a duty to provide medical care

to Mr. Grubbs).  Defendants' argument that they cannot be held liable for Mr. Grubbs'

death because they did not cause him to be in a compromised mental or emotional

state thus does not provide a basis for granting summary judgment in their favor.

### 2.  *Absence of Evidence that Defendants Committed a Wrongful Act Causing Mr. Grubbs' Death*

Defendants also move for summary judgment on the ground that plaintiffs have

presented no admissible evidence that the Weld County defendants committed a

wrongful act leading to Mr. Grubbs' death. *See* Docket No. 139 at 13. The focus of defendants' argument appears to be that there is no evidence the Weld County defendants acted negligently with respect to Mr. Grubbs.[20] Defendants identify three negligent acts alleged in plaintiffs' complaint: (1) uncuffing Mr. Grubbs' hands in the booking vestibule; (2) admitting Mr. Grubbs into the jail after he informed staff that he had swallowed 70 Valium pills; and (3) inadequately supervising Mr. Grubbs after he was admitted to Unit 6. Docket No. 139 at 13. Defendants assert that the first act does not constitute a basis for plaintiffs' wrongful death claims because it is undisputed that Trooper Tyndall, and not staff at the Weld County jail, uncuffed Mr. Grubbs in the booking vestibule. *Id.* at 14. With respect to the second act, defendants primarily contend that Weld County staff did not have the authority to override Nurse Hernandez's decision to admit Mr. Grubbs into the jail. *Id.* at 15-16. Finally, defendants argue that plaintiffs have not identified any admissible evidence showing that Weld County staff negligently supervised Mr. Grubbs in Unit 6. *Id.* at 18.

In their response, plaintiffs generally contend that Mr. Grubbs' death from overdose was foreseeable by Weld County staff and thus defendants had a duty to provide Mr. Grubbs with adequate medical care. *See* Docket No. 169 at 14-19. Plaintiffs further claim that Deputy Lenderink was aware that "she should have called a code for an ambulance to take Mr. Grubbs straight to the hospital" and that, during the

---

[20]Defendants also assert that, "[e]ven if there was some evidence to support Plaintiffs' allegation of negligent supervision, Plaintiffs have not identified any admissible evidence that such negligence was the cause of Mr. Grubbs' death." Docket No. 139 at 18-19. Because defendants do not make any effort to develop this argument, the Court will not consider it for purposes of summary judgment. *See Utahns for Better Transp.,* 305 F.3d at 1175.

four-hour period in which Mr. Grubbs was housed in Unit 6, defendants had 80 separate opportunities to rescue him before he overdosed. *Id.* at 18-19.

Plaintiffs' response fails to create a genuine factual dispute as to whether the Weld County defendants breached their duty of care to Mr. Grubbs by (1) uncuffing him in the booking area or (2) admitting him into the jail after he informed staff that he had ingested 70 Valium pills. Regarding the first act, plaintiffs admit that Trooper Tyndall uncuffed Mr. Grubbs in the booking vestibule contrary to the jail's policy of requiring arrestees to remain restrained until uncuffed by a Weld County deputy. Docket No. 139 at 4, ¶¶ 11-15. Because plaintiffs have adduced no facts or argument demonstrating that Weld County staff were responsible for uncuffing Mr. Grubbs in the booking vestibule, they have not created a genuine dispute of fact as to whether the Weld County defendants acted negligently by uncuffing Mr. Grubbs. Accordingly, defendants are entitled to summary judgment on this issue.

Plaintiffs have also failed to demonstrate a genuine factual dispute as to whether Deputy Lenderink was negligent in failing to send Mr. Grubbs to the hospital. Plaintiffs generally contend that Weld County deputies had a "duty to rescue" Mr. Grubbs by providing him with access to medical care. *See* Docket No. 169 at 16-18. They also assert that Deputy Lenderink "knew that she should have had [sic] called a code for an ambulance to take Mr. Grubbs straight to the hospital instead of booking him." *Id.* at 18. But plaintiffs do not provide any facts, argument, or authority in opposition to defendants' assertion that Deputy Lenderink was not in a position to override decisions by medical staff about whether to send an inmate to the hospital. *See* Docket No. 139 at 17. In their response to defendants' statement of undisputed facts, plaintiffs deny

that "[w]hether a detainee in Mr. Grubbs' position is sent to the hospital is a decision solely made by medical staff at the Jail." *See* Docket No. 169 at 7, ¶ 49; Docket No. 139 at 9, ¶ 49. However, the testimony plaintiffs cite in support of their denial establishes only that CCS was not contracted to provide mental health services at the jail. *See* Docket No. 169-4 at 41:1-2 (stating that CCS was "not contracted for mental health at the Weld County jail"); Docket No. 169-5 at 20, 79:19-22 (stating that CCS "did not have a mental health contract with [Weld County Jail]"). Because such evidence has no bearing on whether medical staff at Weld County Jail were solely responsible for deciding whether to send a detainee to the hospital, it does not create a genuine dispute of fact on that issue. Plaintiffs likewise fail to identify a genuine factual dispute as to whether Deputy Lenderink had the authority to override a medical decision by Nurse Hernandez. In response to defendants' statement of fact that "[j]ail staff cannot override a medical decision made by medical staff," Docket No. 139 at 10, ¶ 50, plaintiffs again cite deposition testimony establishing that CCS was not contracted to provide mental health services. *See* Docket No. 169 at 7-8, ¶ 50. However, such evidence does not demonstrate that Deputy Lenderink had the authority to send Mr. Grubbs to the hospital notwithstanding Nurse Hernandez's decision to the contrary, *see* Docket No. 169-7 at 13, 52:19-20 ("Q. And you can't override the nurse, correct? A. Correct."), much less a "duty to rescue" him. Defendants are therefore entitled to summary judgment on this issue.

The Court reaches the opposite conclusion with respect to defendants' supervision of Mr. Grubbs after he was transferred to Unit 6. Defendants assert that plaintiffs "have not identified any admissible evidence to demonstrate that the Weld

County Defendants negligently supervised Mr. Grubbs after he was placed in his cell." Docket No. 139 at 18. However, in their response to defendants' motion, plaintiffs cite Dr. Metzner's expert report in which he expresses concerns regarding both the quality of the observation walkthroughs conducted on Level 1 suicide watch and defendants' failure to supplement those walkthroughs with clinical checks by nursing staff. *See* Docket No. 169 at 10, ¶¶ 70-71; Docket No. 169-12 at 10. Dr. Metzner opines that the "sequence of events raises the question of the nature and the quality of the[] observation walk-throughs" because "it is likely that [Mr. Grubbs] was demonstrating effects of the overdose well before" Weld County deputies found Mr. Grubbs unresponsive in his cell. Docket No. 169-12 at 10. Dr. Metzner further states that "it was below the standard of correctional healthcare to have not supplemented the SUW1 process with frequent (e.g., every 30 minutes) clinical checks by nursing staff for at least 4-5 hours." *Id.* at 11. Viewed in a light most favorable to plaintiffs, Dr. Metzner's expert opinions create a genuine factual dispute as to whether the Weld County defendants negligently supervised Mr. Grubbs in Unit 6.[21]

_____

[21]Defendants admit that Dr. Metzner's expert report "speaks for itself," but argue, without citing any authority, that the report constitutes inadmissible hearsay. Docket No. 177 at 6, ¶¶ 70-71. The Court finds that Dr. Metzner's expert report is admissible for purposes of summary judgment. Evidence submitted at the summary judgment stage "need not be submitted in a form that would be admissible at trial" so long as the "content or substance of the evidence" would be admissible. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (internal quotation marks omitted). Plaintiffs can introduce Dr. Metzner's opinions through expert testimony. *See Navajo Nation Human Rights Comm'n v. San Juan Cty.*, 281 F. Supp. 3d 1136, 1162 (D. Utah 2017) (finding, "[b]ased on Rule 56(c) and the corresponding framework supplied by the Tenth Circuit," that challenged expert reports were "admissible for purposes of summary judgment because "the *substance* of the reports would plainly be admissible at trial in the form of expert testimony"). Defendants also argue that the "standard of correctional healthcare" referenced in Dr. Metzner's opinion applies only to

Because the Court finds that there is a genuine dispute of material fact regarding whether the Weld County defendants acted negligently in their supervision of Mr. Grubbs in Unit 6, summary judgment will be denied as to this issue.

### C.  CCS Defendants' Motion for Summary Judgment

In their motion for summary judgment, the CCS defendants request a court order dismissing CCS from this lawsuit on the ground that plaintiffs cannot legally maintain a negligence claim against both CCS and Nurse Hernandez.  Docket No. 144 at 1. Defendants further request a judicial determination that Colorado State Patrol Trooper Travis Tyndall was negligent and an order permitting the jury to consider Mr. Tyndall's negligence in determining defendants' liability.  *Id.* at 1, 18.

#### 1.  Negligence Claims Against CCS

Defendants argue that the Colorado Supreme Court's decision in *Ferrer v. Okbamicael*, 390 P.3d 836 (Colo. 2017), precludes plaintiffs from maintaining wrongful death claims against both CCS and Nurse Hernandez.  Docket No. 144 at 11-12.  In *Ferrer*, the Colorado Supreme Court held that a plaintiff's direct negligence claims against an employer are barred when the employer acknowledges vicarious liability for the negligence of its employee.  390 P.3d at 841-42.  Defendants contend that, because plaintiffs' wrongful death claims against CCS are entirely predicated on the alleged negligence of Nurse Hernandez and CCS has acknowledged vicarious liability for Nurse Hernandez's conduct, *Ferrer* mandates the dismissal of CCS from this

---

Nurse Hernandez.  Docket No. 177 at 6, ¶ 71.  The Court disagrees.  The opinions cited above clearly pertain to the responsibilities of the Weld County defendants in their administration of the SUW1 process, not to the nursing standard of care.

lawsuit. Docket No. 144 at 12. In their response, plaintiffs accept defendants' interpretation of *Ferrer*, but argue that plaintiffs have "alleged . . . that CCS's own negligence was . . . an independent and direct cause of Grubbs' injuries, . . . separate and distinguished from any negligent act of Hernandez." Docket No. 164 at 15. Specifically, plaintiffs assert that CCS committed the following "independent acts" of negligence: (1) CCS negligently placed Nurse Hernandez in a position to decide whether Mr. Grubbs should be sent to the emergency room; (2) Nurse Hernandez's supervising nurse, Deborah Weatherwax, did not call the on-duty provider or send Mr. Grubbs to the emergency room; and (3) two other CCS nurses, Lyza Carter and Veronica Rocha-Gallegos, "chose not to implement any one of three separate withdrawal protocols, monitoring, or additional screening" despite knowledge that Mr. Grubbs had swallowed 48 valium pills. *Id.* at 15. Plaintiffs also cite "policies and procedures, written and implemented by CCS" as an additional basis for liability. *Id.* In their reply, defendants contend that these additional acts of negligence represent new theories of recovery and thus cannot serve as a basis for denying summary judgment. Docket No. 167 at 6.

Because plaintiffs have admitted that "[t]he complaint states no claim against CCS for negligent hiring, retention, supervision, or training," Docket No. 144 at 10, ¶ 75; Docket No. 164 at 10, ¶ 75, plaintiffs cannot avoid summary judgment by contending that CCS negligently placed Nurse Hernandez in a position to determine whether Mr. Grubbs should be sent to the hospital. The Court will therefore confine its analysis to whether plaintiffs have asserted a theory of recovery based on CCS's policies and

procedures or the negligent acts of other members of the nursing staff.

The "pretrial order measures the dimensions of the lawsuit, both in the trial court and on appeal." *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1304 (10th Cir. 2003) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 16(d) (stating that the pretrial order "controls the course of the action unless the court modifies it"). Accordingly, any "claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim." *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002). While a trial court has the discretion to exclude claims or issues not included in the pretrial order, *see Rios v. Bigler*, 67 F.3d 1543, 1549 (10th Cir. 1995), "pretrial orders are to be liberally construed to cover any of the legal or factual theories that might be embraced by their language." *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (unpublished) (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)). When a pretrial order is ambiguous, a court "must evaluate the order contextually to determine whether the claim was contained therein." *Wilson*, 303 F.3d at 1216. "[T]he primary purpose of pretrial orders is to avoid surprise by requiring parties to fully and fairly disclose their views as to what the real issues of the trial will be." *Zenith Petroleum Corp.*, 656 F. App'x at 887.

In this case, the pretrial order alleges that "the CCS Defendants were negligent in the death of Barton Grubbs" because they "failed in their respective standard of care to protect Mr. Grubbs after identifying him as suicidal." Docket No. 157 at 2. The order

further states that Nurse Hernandez acted negligently and with deliberate indifference in failing to send Mr. Grubbs to the hospital, practicing medical care beyond her capabilities, and failing to seek the assistance of the supervising physician and registered nurse. *Id.* at 2-3. Contrary to plaintiffs' assertions, there is no indication that plaintiffs' wrongful death claims are predicated on CCS's policies or procedures or the negligent acts of other members of the nursing staff, such as Nurses Weatherwax, Carter, and Rocha-Gallegos. Even viewing the order in combination with the operative complaint, *see Wilson*, 303 F.3d at 1216, plaintiffs' allegations cannot fairly be read as asserting these theories of liability. In the order on defendants' motion to dismiss, this Court determined that "[t]he only CCS policy identified in the complaint is that CCS has a 'budgetary monetary cap on booked detainee's hospitalization costs, [which] creates a deliberate indifference in health care standards to an inmate.'" Docket No. 92 at 10. Because there were no allegations in the complaint that "the budget was the moving force behind defendants' decision not to send Mr. Grubbs to the hospital," the Court found the policy insufficient to support a claim for deliberate indifference. *Id.*

This Court's prior order dismissing plaintiffs' deliberate indifference claim against CCS controls the issue of whether plaintiffs have adequately asserted "policies and procedures, written and implemented by CCS" as an additional basis for their wrongful death claims. As defendants argue, "[a]fter the Court's dismissal, the complaint contained no remaining allegations that CCS's policies were inadequate" and plaintiffs never sought to amend their complaint to add additional allegations regarding CCS's policies and procedures. Docket No. 167 at 6. Accordingly, plaintiffs may not rely on CCS's "policies and procedures" to avoid summary judgment. *See Hullman v. Bd. of*

33

*Trustees of Pratt Cmty. Coll.*, 950 F.2d 665, 668 (10th Cir. 1991) (citing holding of *Southern California Retail Clerks Union v. Bjorklund,* 728 F.2d 1262, 1264 (9th Cir. 1984), that "issues not preserved in the pretrial order" may not be used "in resisting a motion for summary judgment").

The complaint and pretrial order were also insufficient to place defendants on notice that plaintiffs would be asserting vicarious liability for the negligent acts of other members of the nursing staff, namely, Nurses Weatherwax, Carter, and Rocha-Gallegos. As noted above, the pretrial order focuses exclusively on the negligence of Nurse Hernandez and does not give any indication that plaintiffs' wrongful death claims against CCS are predicated on the negligent acts of other members of the medical staff. Moreover, plaintiffs' complaint contains only a handful of allegations potentially relevant to this theory of liability: (1) Nurse Weatherwax instructed Nurse Hernandez to check the label on the prescription bottles and then call the provider to see if there was anything she could give Grubbs to counteract the effects of the medications; (2) Nurse Weatherwax "did not have anything more to do with Mr. Grubbs" after giving these instructions; (3) no one ever called the provider regarding Mr. Grubbs; (4) Mr. Grubbs was transported to Housing Unit 6, where he was "supposed to be under the supervision of the East side of the jail's medical staff"; (5) Nurse Hernandez called the medical office on the East side of the jail to tell them to do a medical screening for possible withdrawal symptoms, but no medical screening was ever performed; and (6) plaintiffs' wrongful death claim is based, in part, on "the negligent supervision of Barton Grubbs after he was placed in his cell." Docket No. 66 at 14-16, 22, ¶¶ 105, 106, 108, 119, 125-26, 191. Importantly, plaintiffs never allege that Nurse Weatherwax acted

34

negligently in failing to provide additional care to Mr. Grubbs or contact the on-duty provider. And, although plaintiffs' allegations regarding the failure of "medical staff" on the East side of the jail to conduct a medical screening could be construed as a claim of negligence, plaintiffs did not make any attempt to develop this claim with allegations that the failure to conduct a medical screening was below the standard of care or that CCS was vicariously liable for such conduct. *Compare id.* at 26, ¶¶ 213-14 (alleging that Nurse Hernandez was an employee of CCS and that CCS was responsible for her actions). In light of the fact that the final pretrial order makes no mention of Nurses Weatherwax, Carter, or Rocha-Gallegos, the Court finds that the sparse allegations in plaintiffs' complaint are insufficient to place defendants on notice of this basis for liability. *See Hullman*, 950 F.2d at 667-68 (affirming summary judgment in favor of defendant on free speech claim where pretrial order failed to identify complaint regarding college's financial mismanagement as protected speech supporting his First Amendment claim); *Bednasek v. Kobach*, 259 F. Supp. 3d 1193, 1212 (D. Kan. 2017) (finding that neither operative complaint nor pretrial order could be read as placing defendant on notice that plaintiff "was pursuing a facial challenge based on subsection (n) of the statute under the Privileges or Immunities Clause").

Moreover, defendants filed their summary judgment motion seeking dismissal of CCS from the lawsuit under *Ferrer* on February 7, 2018. Docket No. 144. The final pretrial order was not entered until February 21, 2018. Docket No. 157. Plaintiffs thus had ample notice of defendants' argument that plaintiffs' wrongful death claims against CCS were based solely on Nurse Hernandez's negligent conduct. However, plaintiffs did not take the opportunity to clarify their theories of liability in the final pretrial order.

Plaintiffs' conduct supports a conclusion that they never intended to pursue such theories at trial.

Although the Court finds that plaintiffs' wrongful death claims against CCS are predicated solely on CCS's vicarious liability for the alleged negligence of Nurse Hernandez, defendants fail to demonstrate that CCS should be dismissed from this lawsuit. *Ferrer* establishes that a plaintiff may not pursue claims for direct negligence against an employer who has admitted vicarious liability for the negligent acts of its employee. There is nothing in the case to indicate that a defendant should be dismissed from a lawsuit merely because the only remaining claims against that defendant are based on vicarious liability. Several reported cases have proceeded to trial against the principal even when vicarious liability claims were the only claims remaining. *See, e.g.*, *Bautista v. MVT Servs., LLC*, No. 16-cv-01086-NYW, 2017 WL 6054888, at *7 (D. Colo. Dec. 7, 2017) (granting motion to exclude certain expert opinions at trial where the opinions pertained to direct negligence of defendant, but the only claims asserted were based on vicarious liability); *Marso v. Homeowners Realty, Inc.*, 2018 WL 775629, at *1 (Colo. App. 2018) (holding that monetary settlement with agent was correctly set off against "jury verdict returned against the principal when the principal's liability [was] entirely dependent on the doctrine of respondeat superior"); *Bogdanski v. Budzik*, 408 P.3d 1156, 1164, 1166 (Wyo. 2018) (affirming dismissal of direct negligence claim based on *McHaffie* rule adopted in *Ferrer*, but finding that plaintiff was "entitled to try his luck with a jury on his vicarious liability claim"). Defendants cite no other basis or authority for dismissing CCS from this action.

Accordingly, defendants' request for an order of dismissal will be denied.

## 2. *Negligence of Trooper Tyndall*

Defendants move for a judgment as a matter of law that Trooper Tyndall was negligent. Docket No. 144 at 18. Because a nonparty's fault constitutes an affirmative defense, *see Bethel v. United States ex rel. Veterans Admin. Med. Ctr. of Denver, Colo.*, 544 F. App'x 807, 812 (10th Cir. 2013) (unpublished), defendants must provide credible evidence establishing each essential element of the defense. *See Harper v. Mancos Sch. Dist. RE-6*, 837 F. Supp. 2d 1211, 1217 (D. Colo. 2011).

To prevail on a negligence claim under Colorado law, a party must show: (1) the existence of a legal duty of care; (2) breach of that duty; (3) injury; and (4) causation. *Westin Operator, LLC*, 347 P.3d at 612. Defendants assert that all four of these elements are established with respect to Trooper Tyndall. Docket No. 144 at 13-18. Specifically, they contend that Trooper Tyndall owed Mr. Grubbs "a duty of reasonable care and affirmative protection . . . based on the special custodial relationship" and that Trooper Tyndall breached that duty by: (1) failing to separate Mr. Grubbs from his medications during transport to the Weld County Jail; (2) uncuffing Mr. Grubbs once inside the booking vestibule at the jail; (3) turning his back on Mr. Grubbs while Mr. Grubbs was unrestrained; and (4) failing to communicate certain information to Weld County staff once he knew, or should have known, that pills were missing from Mr. Grubbs' medication bottles. *Id.* at 14-17.[22] Defendants contend that Trooper Tyndall's

---

[22]Defendants' argument that Trooper Tyndall was negligent in uncuffing Mr. Grubbs in the booking vestibule is based on a jail rule that prisoners had to be restrained behind their back or belly belted until released by a Weld County deputy. *See* Docket No. 144 at 15. However, defendants do not discuss the purpose of the

actions enabled Mr. Grubbs to overdose on his medications, thereby causing his death. *Id.* at 18. Plaintiffs do not dispute that Trooper Tyndall "owed a duty of custodial care" to Mr. Grubbs. Docket No. 164 at 16. However, they contend that Trooper Tyndall's conduct was not the proximate cause of Mr. Grubbs death. *Id.*[23]

As discussed above with respect to the Weld County defendants' summary judgment motion, the doctrine of proximate causation is "an attempt to spell out rules of law limiting the liability of a negligent actor, using the *language* of causation." *Moore*, 192 P.3d at 436. "[F]oreseeability is the touchstone of proximate cause." *Westin Operator, LLC*, 347 P.3d at 614 n. 5. Thus, a defendant's conduct will not be considered the proximate cause of a plaintiff's injury if "it was necessary that the conduct combine or join with an intervening cause which also contributed to cause the injuries, but which would not have been reasonably foreseen by a reasonably careful person under the circumstances." *Moore*, 192 P.3d at 436 (quoting *Scharrel v. Wal-Mart Stores, Inc.*, 949 P.2d 89, 93 (Colo. App. 1997)); *see also Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 81 (Colo. 2001) ("An intervening cause only relieves the defendant of liability if it was not reasonably foreseeable."). Whether an intervening cause was reasonably foreseeable is ordinarily a question of fact for the jury. *Westin*

---

rule, e.g., whether it is designed to protect jail personnel as opposed to the subject prisoner, and whether a knowing violation of the rule is sufficient to establish the standard of care applicable to Trooper Tyndall vis-á-vis Mr. Grubbs, who is not a correctional officer or jail employee.

[23]Plaintiffs also assert that Colo. Rev. Stat. § 13-21-111.5 is not applicable to their claims for deliberate indifference under § 1983. However, defendants do not argue that the statute is applicable to plaintiffs' deliberate indifference claim. *See* Docket No. 144 at 12 (asserting that "Colorado's comparative fault statute applies to [plaintiffs'] *state law claims*" (emphasis added)).

*Operator, LLC*, 347 P.3d at 614 n.5; *see also Ekberg v. Greene*, 588 P.2d 375, 377 (Colo. 1978) (finding that the "[t]he court of appeals was mistaken . . . in taking the determination of proximate cause away from the jury" and noting that, "[r]ather than resting on mechanistic rules of law to determine tort liability, a court should ordinarily allow the jury to make a determination of what is reasonable in each factual setting").

        In Colorado, suicide is typically considered an intervening act sufficient to relieve an antecedent tortfeasor of liability. *See Moore*, 192 P.3d at 436 (noting that "suicide is usually treated as a voluntary and willful choice"). Although Colorado courts have not applied this rule in the precise circumstances presented here, they have recognized decisions from other jurisdictions establishing that a person's suicide does not automatically absolve a defendant of liability where a special relationship existed between the defendant and the deceased. *See id.* at 432 (noting that, "[i]n negligence cases, courts have been unwilling to recognize any duty, breach of which would make a defendant liable for suicide based only on actual causation, absent a special relationship involving, treatment, supervision, or custodial control of the deceased"); *English v. Griffith*, 99 P.3d 90, 94 (Colo. App. 2004) (noting that "absent a special relationship, a person generally has no duty to take action for the protection of another"); *see also City of Richmond Hill v. Maia*, 800 S.E.2d 573, 577-78 (Ga. 2017) (recognizing "special relationship exception" to "general rule that suicide absolves an alleged tortfeasor of liability" as a matter of law). *Cockrum v. State*, 843 S.W.2d 433 (Tenn. App. 1992), is one such decision. Cited by the Colorado Court of Appeals in *English v. Griffith*, *Cockrum* establishes that a prisoner's suicide is not, as a matter of

law, "an independent, intervening act" sufficient to relieve a prison of liability for negligent supervision. 843 S.W.2d at 436-37. In reaching that holding, the court explained that, "[i]n the custodial context, when the intervening act is itself the foreseeable harm that gives rise to the custodian's duty, the custodian who fails to prevent the act will not be relieved from liability simply because the act has occurred." *Id*. at 437.

However, even in cases recognizing a duty on the part of law enforcement officials to protect individuals in their custody from self-harm, courts have been reluctant to find liability where an individual's self-destructive acts would not have been reasonably foreseeable to a person in the defendant's position. *See, e.g.*, *Timson v. Juvenile & Jail Facility Mgmt. Servs., Inc.*, 355 F. App'x 283, 284-85 (11th Cir. 2009) (unpublished) (granting summary judgment in favor of correctional facility where plaintiff failed to present evidence demonstrating that it was reasonably foreseeable that inmate would commit suicide); *Joseph v. State*, 26 P.3d 459, 476-77 (Alaska 2001) (holding that "[j]ailers need make only reasonable efforts to protect prisoners from intentionally inflicted self-harm that is reasonably foreseeable"); *Cockrum*, 843 S.W.2d at 436-37 (finding that inmate's suicide did not relieve prison of liability where "[t]he evidence in th[e] case demonstrate[d] that the [prison] staff knew or should have known that [the decedent] was capable of self-destructive acts"). Some courts have addressed the issue of foreseeability as part of the duty analysis. *See, e.g.*, *Cockrum*, 843 S.W.2d at 437 (finding, based on evidence that prison staff knew or should have known that inmate would attempt suicide, that staff "had a duty to take reasonable precautions to

protect Ms. Cockrum from injuring herself"). As the Colorado Supreme Court has noted, "the concepts of duty and proximate cause are often interchangeable." *Moore*, 192 P.3d at 434. Both involve the exercise of policy judgments regarding the extent to which an individual should be held liable for certain negligent acts. *See Westin Operator, LLC*, 347 P.3d at 615 (explaining that duty and proximate cause are both ways of placing limits on liability); *Walcott v. Total Petroleum, Inc.*, 964 P.2d 609, 612 (Colo. App. 1998) ("[W]hen both duty and proximate cause are at issue, the determination under either concept of whether a risk was reasonably foreseeable as a matter of law depends in part on the common sense consideration of the risks created by various conditions and circumstances and in part in the policy consideration of whether a defendant's responsibility should extend to the results in question." (internal citation omitted)). Although it is not clear whether Colorado courts would treat the foreseeability of an arrestee's suicide while in custody as an issue of duty or proximate cause, *see Moore*, 192 P.3d at 432 (noting that courts in negligence cases "have been unwilling to recognize any duty, breach of which would make a defendant liable for suicide based only on actual causation, absent a special relationship," but further stating that courts have otherwise "found proximate cause only in very narrow circumstances"), the Court need not resolve the issue.[24] In either case, defendants

_____

[24]In *Westin Operator, LLC*, the Colorado Supreme Court addressed the difference between the duty and proximate cause inquiries as follows:

> [D]uty is a preferable means for addressing limits on liability when those limitations are clear, are based on relatively bright lines, are of general application, do not usually require resort to disputed facts in a case, implicate policy concerns that apply to a class of cases that may not be fully appreciated by a jury deciding a specific case, and are employed in

have not presented any evidence or argument demonstrating that Mr. Grubbs' act of ingesting the pills would have been reasonably foreseeable to a law enforcement officer in Trooper Tyndall's position. *See Walcott*, 964 P.2d at 611-12 (noting that both duty and proximate cause involve "the common question of foreseeability" and granting summary judgment in favor of operator of filling station on ground that, "whether analyzed under the rubric of duty or proximate cause, the risk that a purchaser would intentionally throw gasoline on a victim and set the victim on fire was not reasonably foreseeable"). Trooper Tyndall's deposition testimony indicates just the opposite. Trooper Tyndall testified that Mr. Grubbs gave no indication that he was suicidal before arriving at the Weld County jail. *See* Docket No. 169-2 at 6, 11, 21-22, 22:5-22, 44:18-19, 81:20-82:1, 86:6-87:1. He even noted that Mr. Grubbs called his father while at the Weld County substation and ended the call by saying, "I'll see you tomorrow." *Id.* at 6, 22:16-17. A reasonable juror could therefore find that Mr. Grubbs' act of ingesting the pills in the booking vestibule was an unforeseeable intervening cause of his death and thus sufficient to relieve Trooper Tyndall of liability.

Because defendants have failed to establish that Mr. Grubbs' suicidal act was foreseeable as a matter of law, they are not entitled to summary judgment on the issue

---

cases in which early resolution of liability is particularly desirable. . . . On the other hand, when the limits imposed require careful attention to the specific facts of the case, . . . scope of liability [or proximate cause] is a more flexible and preferable device for placing limits on liability.

347 P.3d at 615.

of Trooper Tyndall's liability.[25]

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Rule 702 Motion to Exclude Dr. Metzner's Testimony [Docket

No. 138], filed by defendants Correct Care Solutions, LLC and Christin Hernandez is

**GRANTED** in part and **DENIED** in part as stated in this order. It is further

**ORDERED** that Defendants the Weld County Sheriff's Office and the Board of

County Commissioners of the County of Weld's Motion for Summary Judgment [Docket

No. 139] is **GRANTED** in part and **DENIED** in part as stated in this order. It is further

---

[25]Defendants predicate their affirmative defense in part on Trooper Tyndall's failure to inform Nurse Hernandez and Deputy Sutherland of certain information regarding the number of pills in the prescription bottles, namely, (1) that the paramedics had confirmed, based on the number of pills, that Mr. Grubbs was not abusing his medications; and (2) that Trooper Tyndall did not know how many pills were in Mr. Grubbs' medication bottles at the substation. Docket No. 144 at 17. Defendants also assert that Trooper Tyndall was negligent in failing to count the number of pills in the bottles. *Id.* Because the first two acts occurred after Mr. Grubbs ingested the pills, the doctrine of superseding cause would not apply to relieve Trooper Tyndall of liability. *See Archuletta*, 2014 WL 5149298, at *5 n.7 (citing *Trask*, 446 F.3d at 1046). However, these acts are not sufficient to establish Trooper Tyndall's negligence as a matter of law. Defendants do not cite to any evidence or case law demonstrating that Trooper Tyndall violated the applicable standard of care. Moreover, Trooper Tyndall testified that he informed both Deputy Sutherland and Nurse Hernandez that there was a possibility that an unknown number of pills was missing from the bottles. Docket No. 169-2 at 9, 36:9-25; *see also* Docket No. 139-1 at 5. He also asked Mr. Grubbs in the presence of Deputy Sutherland and Nurse Hernandez what had "happened to all of the pills that had been previously observed in the prescription bottles while at the substation." Docket No. 139-1 at 5. Based on this evidence, a reasonable jury could find that Trooper Tyndall acted appropriately to apprise Weld County staff of a possible problem after realizing that the medications were missing. Accordingly, Trooper Tyndall's failure to provide additional information does not establish that he was negligent as a matter of law. *See City of Aurora v. Loveless*, 639 P.2d 1061, 1063 (Colo. 1981) (noting that "questions of negligence . . . are issues of fact to be determined by the jury").

**ORDERED** that CCS and Nurse Hernandez's Motion for Summary Judgment

[Docket No. 144] is **DENIED**.


DATED June 26, 2018.

BY THE COURT:


_s/Philip A. Brimmer_____
PHILIP A. BRIMMER
United States District Judge